IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| EDDIE WORDLAW,<br>        Plaintiff,<br><br>vs.<br><br>CITY OF DUBUQUE, IOWA,<br>        Defendant. | Case No. 2:22-cv-01017<br><br>**COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DAMAGES** |

**PRELIMINARY STATEMENT**

The Defendant, the City of Dubuque, administers a discriminatory Tenant Database that disproportionately limits housing choice for Black persons like Plaintiff Eddie Wordlaw. The administration of this database violates the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601 *et seq*. Further, the City violated Wordlaw's due process rights by refusing to disclose the information reported about him in the Tenant Database or allowing him to contest inaccurate information.

**II. JURISDICTION & VENUE**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 3613. Appropriate declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

2. In addition, the Court has jurisdiction over the civil rights claim arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution pursuant to 28 U.S.C. §§ 1331 and 1343.

3. Venue is proper in the Northern District of Iowa because the events giving rise to this action occurred in this judicial district.

1

## III. PARTIES

4. Plaintiff Eddie Wordlaw ("Wordlaw") is a natural person who resides in Iowa.

5. Defendant City of Dubuque is a municipal corporation within Dubuque County, Iowa.

## IV. FACTS

**A. The Department of Housing and Urban Development (HUD) determined in 2013 that Defendant had implemented housing policies that, while facially neutral, had the effect of and were intended to discriminate against Black persons based on race**

6. On June 20-24, 2011, HUD's Office of Fair Housing and Equal Opportunity (FHEO) completed a civil rights related program review for possible civil rights violations in the City of Dubuque's Housing and Community Development Department (HCDD).

7. According to FHEO, "Dubuque operates as a Manager-Council government, and the City Manager exerts great control over City operations as the head professional administrator." *Letter of Findings of Noncompliance* at 1, https://nlihc.org/sites/default/files/Dubuque-LOF.pdf (last visited July 20, 2022). Mike Van Milligan has been Dubuque's City Manager since 1993, and is currently the City Manager of Dubuque.

8. At the time of the review, the HCDD director was David Harris. Director Harris was supervised by and reported to the City Manager.

9. In 2007, HCDD changed the way it implemented residency preference points for its housing choice voucher program. Under the new policy, residents were awarded residency preference points on a cumulative basis whereby applicants received 30 points if they lived in the City of Dubuque, 20 points if they lived in Dubuque County, and 15 points if they lived in the State of Iowa. According to FHEO, "after the implementation of the residency preference point allotment, African American participation in the program substantially declined." *Id*. at 6.

2

10. During the summer of 2009, two high profile murders involving African American perpetrators occurred in Dubuque. FHEO's investigation concluded that "public perception was that violent crime had increased throughout the general community" and that this increase was due to "newcomers from Chicago" who were "predominantly African American." *Id*. at 7. In response to this public perception, the City created a Safe Community Task Force, ordered studies to be conducted on crime and poverty, and began implementing policy changes to the housing choice voucher program. *Id*.

11. In late November-early December of 2009, the City Manager ordered Director Harris to eliminate the very low income preference point allotment. According to FHEO, "by removing the allotment, the City eliminated an avenue via which families from Chicago would qualify for the program's waitlist." *Id*. at 7. FHEO determined that had this preference allotment been kept in place, individuals from outside Iowa, who were disproportionately Black, would have still been eligible for the voucher program. "Elimination of this allotment effectively allowed only those applicants from out of state that qualified for a disabled or elderly preference point allotment to qualify for the program, significantly reducing the number of African Americans who would be eligible for the wait list." *Id*. FHEO noted that an internal memorandum indicated that the intent in making these changes was "to address the community's perceptions on crime" and that "HCDD and City staff were aware that the families applying from out of state were primarily from Chicago and predominantly African American." *Id*. at 8.

12. In December of 2009, the City Manager instructed Director Harris to cease issuing vouchers with the intent of shrinking the size of the voucher program from 1,076 families to 900 families in the City of Dubuque. The City Manager asserted that this reduction was

3

"a result of the City's inability to administer the program effectively." *Id*. FHEO noted that their review "failed to find evidence to substantiate this assertion." *Id*. Additionally, the assertion was belied by the fact that the City chose to conduct "extensive crime studies" and made "payments to the moderators of the Safe Community Task Force meetings," which could have been used for an additional caseworker if administration of the voucher program was really a concern. *Id*.

13. FHEO completed their investigation and issued a Letter of Noncompliance to Defendant on June 17, 2013. The Letter of Noncompliance concluded:

> Based on the evidence obtained during the on-site review, the Department has determined that Dubuque is not in compliance with Title VI, as the City discriminated on the ground of race in the administration of its Section 8 program. Specifically, the Department's review found that Dubuque discriminated against African Americans based on race, by implementing admission policy changes that had the effect of hindering the ability of African Americans to obtain vouchers and relocate to Dubuque…There is evidence also that the City of Dubuque intended to exclude persons from participation in its Section 8 program, deny benefits, and otherwise discriminate on the ground of race.

*Id*. at 5.

14. Defendant entered into a Voluntary Compliance Agreement (VCA) with FHEO, in which it agreed to make extensive changes to its HCDD Administrative Plan, submit to additional oversight and record-keeping requirements with HUD, and for specified city staff to attend Fair Housing Training on an annual basis. The VCA was in effect from 2014 until 2021.

4

B. **Defendant's Tenant Database**

15. In or around September 2011, while under investigation with FHEO, Defendant began implementation of a Tenant Database. According to Defendant's website, the Tenant Database "contains information compiled from landlords owning rental property in the City of Dubuque, property management companies managing property in the City of Dubuque, and Iowa District Court Records." *Landlord Services*, https://www.cityofdubuque.org/1599/LandlordServices#:~:text=Tenant%20Database&text=This%20can%20be%20done%20electronically,it%20will%20remain%20on%20file (last visited July 20, 2022).

16. The Tenant Database includes information such as the rental address, starting and ending dates of the tenancy, whether rent was ever late, whether an eviction was ever filed, the amount of the security deposit and whether the tenant's deposit was returned. Landlords can also provide general comments on the individual's tenancy.

17. On December 11, 2011, City of Dubuque staff Crenna Brumwell and Director Harris gave a presentation to the Safe Community Task Force about the new Tenant Database. According to the minutes of the meeting, staff explained that under the Tenant Database "landlords can choose to provide factual and verifiable information to [the] City," and "[t]enants [are] also permitted to dispute what's on the database." *Dubuque City Council January 17, 2012 Agenda*, at 74, https://cityofdubuque.novusagenda.com/AgendaPublic/ (last visited July 20, 2022).

18. Landlords use the Tenant Database to make decisions about whether to provide housing to a prospective tenant and are encouraged to do so by Defendant.

19. The Tenant Database is administered and maintained by the Dubuque Police Department.

5

According to the City of Dubuque's website, "[l]andlords who would like to participate in submitting information to this database may fill out a Tenant Database Submission Form and submit it to the Dubuque Police Department Records Division." *Id*. Landlords that wish to submit information to the Tenant Database are required to sign a Tenant Database Access Agreement ("the Agreement") with Defendant. The Agreement provides that "[n]either the City of Dubuque; its employees; or officers, collectively or individually; assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information or process disclosed." *Tenant Database Access Agreement and Participant Release, Waiver and Hold Harmless Agreement*, https://www.cityofdubuque.org/DocumentCenter/View/3448/Tenant-Database-Release?bidId= (last visited July 20, 2022).

20. Between 2011 and 2020, landlords made 713 submissions to the Tenant Database. None of these landlord submissions were ever rejected by Defendant.

C. **Defendant Refused to Provide Eddie Wordlaw With Information Reported on their Tenant Database or to Contest this Information**

21. Eddie Wordlaw is Black.

22. In 2020, Wordlaw was searching for an affordable rental unit to accommodate himself and his six children. During his rental search, one prospective landlord told Wordlaw that they would not rent to him because he was on "the database."

23. On July 20, 2020, Wordlaw contacted the Dubuque Police Department and requested a copy of the information that they were reporting about him on the Tenant Database.

24. The Dubuque Police Department refused to provide any information to Wordlaw. On July 23, 2020, the Dubuque Police Department further told him that he was not permitted to contest any information on the Tenant Database, and that ultimately if he disagreed with

6

any of the information on the Tenant Database – which he was not allowed to access – then his only remedy was to sue his former landlord.

25. Upon belief, Defendant has never provided any tenant with information reported about them on the Tenant Database.

**D. <u>The Information the Defendant Reported About Wordlaw on Their Tenant Database Was Inaccurate</u>**

26. Wordlaw previously rented an apartment from Gronen Properties with his significant other, Loucinder Murray. The Tenant Database entry submitted by Gronen Properties about Wordlaw states: "Tenant owes us a total of $3,444.26 for damages, cleaning, paint, and carpet replacement."

27. In fact, while Gronen Properties did file a lawsuit against Wordlaw, the case against him was dismissed because he was never served. *See* Dubuque County Case No. SCSC089428. Wordlaw has asked Gronen Properties to remove his name from the Tenant Database, but they are refusing to do so unless he pays $3,444.26.

28. As a result of the Defendant's actions, Wordlaw suffered loss of a housing opportunity, emotional distress, humiliation, embarrassment, and damage to reputation.

29. Wordlaw has continued to search for an affordable rental unit in Dubuque to accommodate himself and his six children, but he has been unsuccessful.

**E. <u>Defendant's Tenant Database Has an Unlawful Disparate Impact on the Basis of Race</u>**

30. A facially neutral policy or practice that has a disparate impact based on race or national origin violates the Fair Housing Act unless it is necessary to satisfy a substantial, legitimate, non-discriminatory business interest and there is no less discriminatory alternative that would achieve that interest.

31. As set forth below, Defendant's Tenant Database has an unjustified disproportionate adverse impact on Black persons in violation of the Fair Housing Act. Defendant's one-sided and highly unusual Tenant Database is not necessary to achieve a legitimate interest because it does not have any safeguards in place to ensure the accuracy of the information contained in the Tenant Database.

32. According to 2019 census data Dubuque's Black population was 5.2% when Wordlaw tried to access the Tenant Database. https://www.census.gov/quickfacts/dubuquecityiowa (last visited July 20, 2022).

33. Black persons are overrepresented on the Tenant Database when compared to 2019 City of Dubuque Census data. Upon belief, Black tenants are overrepresented on the Tenant Database by 14.0%. White tenants, by contrast, are underrepresented on the Tenant Database by 52.9%.

34. In addition to being overrepresented on the Tenant Database, Black persons receive more negative comments and fewer positive or neutral comments from landlords than white persons on the database.

35. The fact that Black tenants are overrepresented on the Tenant Database and are significantly more likely to receive negative comments demonstrates that the Tenant Database has a strong disproportionate impact that limits housing choice for Black people in the City of Dubuque.

36. Defendant asserts that the Tenant Database will make neighborhoods safe, ensure rental properties are maintained, and hold tenants accountable. Protecting resident safety may be a legitimate interest, but not if Defendant fails to utilize any safeguards to ensure that the information contained in the Tenant Database is accurate.

F. **Defendant's Tenant Database Constitutes Intentional Discrimination in Violation of the Fair Housing Act**

37. Wordlaw, through counsel, sent a letter to the Defendant on April 6, 2021 apprising them that the Tenant Database had a discriminatory impact on Black persons and lacked procedural safeguards, but the Defendant refused to adequately address these concerns.

38. The strong discriminatory effect of the Tenant Database against Black persons, FHEO's determination that Defendant was intentionally discriminating against Black persons contemporaneously with when the Tenant Database was first adopted, and Defendant's refusal to implement procedural safeguards to ensure the information on the Tenant Database is accurate, are all factors that indicate a discriminatory intent on the part of Defendant.

## COUNT I: FAIR HOUSING ACT

39. Defendant's Tenant Database has a disproportionate adverse impact on Black persons as compared to similarly situated white persons. The Tenant Database fails to achieve any substantial, legitimate non-discriminatory interest if Defendant does not have any procedural safeguards in place to ensure that the information contained in the Tenant Database is accurate.

40. Defendant's policies and practices constitute unlawful discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604, by making housing unavailable on the basis of race in violation of 42 U.S.C. § 3604(a).

41. As a result of Defendant's discriminatory conduct, Wordlaw has suffered damages and is entitled to relief pursuant to 42 U.S.C. § 3613.

42. Defendants' discriminatory conduct was intentional, willful, reckless, deliberately indifferent to, and/or otherwise taken in disregard for the rights of Wordlaw.

## COUNT II: 42 U.S.C. § 1983 – DUE PROCESS VIOLATIONS

43. The operation and maintenance of the Tenant Database by the City constitutes state action under color of law for the purposes of 42 U.S.C. § 1983.

44. In general, to determine whether the basic requirements of due process have been met, a court must weigh:

    a. the private interest that will be affected by the official action;

    b. the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional procedural safeguards; and

    c. the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail.

    *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

45. The City has the following customs or policies which violate procedural due process:

    a. Failing to provide notice that information has been provided about them on the Tenant Database;

    b. Denying tenants access to see what has been written about them on the Tenant Database;

    c. Failing to implement procedures of any kind which would allow a tenant to challenge incorrect, misleading, or incomplete information on the Tenant Database.

46. Wordlaw has a fundamental liberty interest in his reputation in general, especially but not limited to the impact of the commentary in the database on his ability to secure and maintain safe and affordable housing.

47. Wordlaw's interest in his reputation combined with his tangible need for decent and affordable housing for himself and his children also establishes a cognizable property interest.

48. The City's procedures provide no protection against erroneous deprivation of this interest.

49. The City's operation and maintenance of the Tenant Database is not an essential governmental function, and upon information and belief such a program is highly unusual across the state and the nation as a whole. The Tenant Database itself serves no purpose other than to make it more difficult for some tenants to find housing. Cessation of the operation of the Tenant Database would not pose any significant administrative burden on the City, and would in fact reduce any such burden that currently exists.

## RELIEF REQUESTED

Wherefore, Plaintiff requests this honorable Court provide the following relief:

a. Declaring Defendant's actions violate the Fair Housing Act and Due Process;

b. Granting a temporary restraining order and a preliminary and permanent injunction enjoining Defendant from administering the Tenant Database;

c. Awarding Plaintiff such damages as would fully compensate him for his injuries caused by Defendant's discriminatory housing practices and violations of due process of law;

d. Awarding punitive damages in an amount that would punish Defendant for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

e. Awarding reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c) and 42 U.S.C. § 1988.

f. All other remedies equitable and just as the court may deem appropriate.

Respectfully Submitted,


*/s/ Todd Schmidt*
Todd Schmidt
Attorney for Plaintiff
IOWA LEGAL AID
744 Main Street; Suite 1
Dubuque, IA 52001-6825
TEL: (563) 588-4653
EMAIL: tschmidt@iowalaw.org


*/s/ Alex Kornya*
Alexander Vincent Kornya
Attorney for Plaintiff
IOWA LEGAL AID
1111 9th Street; Suite 230
Des Moines, IA 50314
TEL: (515) 243-1193
EMAIL: akornya@iowalaw.org